# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**LADIES MEMORIAL ASSOCIATION, INC., et al.,**

    Plaintiff,

v.                                            CASE NO. 3:20cv5681-MCR-EMT

**CITY OF PENSACOLA, FLORIDA, et al.,**

    Defendants.

_____/

## ORDER

Plaintiffs Ladies Memorial Association, Inc. ("LMA"), Randall Crooke, Save Southern Heritage, Inc. ("SSH"), and Veterans Monuments of America, Inc. ("VMA") filed this action, alleging numerous state and federal claims against Defendants City of Pensacola (the "City") and Laurel Lee, in her Official Capacity as Secretary of State, ("Secretary Lee") related to the proposed removal of a confederate "cenotaph"[1] located in Pensacola, Florida. The City has filed a motion to dismiss for lack of standing and failure to state a claim. On thorough consideration, the motion is granted.

---

[1] "A cenotaph is '[a]n empty tomb or a monument erected in honor of a person who is buried elsewhere.'" *Gardner v. Mutz*, 962 F.3d 1329, 1335 n.2 (11th Cir. 2020) (quoting *Webster's Second New International Dictionary* 433 (1934)).

**Background**

The basic facts, as alleged in the Complaint, ECF No. 1-1, and construed in favor of Plaintiffs, are as follows.

Plaintiffs include a group of organizations and individuals with an interest in preserving the confederate cenotaph located in Florida Square, (formerly "Lee Square"), in downtown Pensacola, Florida. Specifically, LMA is a "reconstituted entity"[2] that originally erected the cenotaph and whose members include ancestors of confederate soldiers honored by the monument. Crooke is a descendant of a confederate soldier and a member of "the Stephen Russell Mallory Camp 1315, Sons of Confederate Veterans" ("SCV Camp"), a subdivision of Sons of Confederate Veterans, Inc. ("SCV"). ECF No. 1-1 at 8–9. SSH is the Florida chapter of "a South Carolina non-profit organization whose purpose is historical preservation, specifically the history of the South for future generations." *Id.* at 9. VMA is a Florida not-for-profit corporation dedicated to the protection and preservation of military memorials.

On June 8, 1887, the City of Pensacola, which was then run by a state-appointed commission, adopted an ordinance renaming Florida Square as Lee Square, in honor of Confederate General Robert E. Lee. The commission also approved plans to erect a confederate cenotaph in the square, which was

---

[2] Plaintiffs do not specify when LMA was "reconstituted" or explain what this means.

commissioned by the LMA.³ In 1891, the project was completed and the cenotaph was erected.⁴ The cenotaph is a 50-foot tall shaft with an 8-foot tall statue atop, which, according to the complaint, honors a number of historical figures, including former U.S. Senator Stephen R. Mallory, former Florida Governor Edward A. Perry, and former U.S. Senator and President of the Confederate States of America Jefferson Davis. The memorial is inscribed with the following**:** "Our Confederate Dead"; "Uncrowned Heroes… Whose Joy Was to Suffer and Die…"; and "Tis Not In Mortals to Command Success; But We'll Do More, Sempronius, We'll Deserve It." ECF No. 1-1 at 4–5. Plaintiffs allege that the memorial has been used by LMA and SCV for memorial observances and that SCV has spent "thousands of dollars and thousands of man-hours maintaining and improving Lee Square and the Cenotaph." *Id.* at 6.

On July 14, 2020, the Pensacola City Council voted 6-1 to remove the cenotaph and voted unanimously to restore the square's original name, Florida Square.⁵ On the same date, Plaintiffs filed the instant action for declaratory and

---

³ LMA members also helped raise funds for the cenotaph "by holding lectures, benefit suppers, auctions, and horse races." ECF No. 1-1 at 4.

⁴ The complaint contains a typographical error regarding the date the cenotaph was erected.

⁵ While not necessary to the Court's decision, the Court takes judicial notice of the minutes of the city council meeting, which were referenced in the City's affidavit in support of its motion to dissolve, ECF No. 8-1, to provide context. *See* City of Pensacola City Counsel, Special Meeting Minutes dated July 14, 2020 at 4, available at https://pensacola.legistar.com/Calendar.aspx (last visited August 28, 2020); *see also Vestavia Plaza, LLC v. City of Vestavia Hills, Ala.*, No. 2:11-

injunctive relief in the Circuit Court for Escambia County, Florida, raising various state and federal claims, including a free speech claim pursuant to the United States and Florida constitutions.[6] Plaintiffs also filed a motion for a temporary restraining order ("TRO") and preliminary injunction against the City, seeking to prevent the removal of the cenotaph, which was granted by the state court pending a preliminary injunction hearing. On July 21, 2020, Plaintiffs filed a motion for contempt against the City for alleged violations of the TRO.

On July 27, 2020, the City removed the action to this Court. ECF No. 1. After removal, the Court held a telephone conference, following which– and with the parties' consent– it extended the TRO to August 24, 2020[7] and set various deadlines for motions and responses. Thereafter, the City filed its motion to dismiss on July 30, 2020, ECF No. 7, and motion to dissolve the TRO on August 5, 2020, ECF No.

---

CV-4152-TMP, 2013 WL 4804196, at *2 (N.D. Ala. Sept. 9, 2013) (taking judicial notice of city council minutes).

[6] Specifically, the Complaint raised the following claims against the City: 1) violation of Pensacola City Ordinance § 12-2-10(b)(1); 2) violation of Pensacola City Ordinance § 12-2-9; 3) violation of Fla. Stat. § 852.02; 4) violation of Fla. Stat. § 276.031(5)(h); 5) Breach of Bailment Agreement; 6) violation of 16 U.S.C. § 470a; and 7) violations of plaintiffs' right to free speech under the Florida and United States constitutions, due process under the Fifth Amendment, equal protection under the Fourteenth Amendment, and a violation of 42 U.S.C. § 1983. *See* ECF No. 1-1. The complaint also raised claims against Secretary Lee for violations of Fla. Stat. § 276.031 and 16 U.S.C. § 470a. *See id.*

[7] The parties consented to an extension of the TRO to August 24, 2020 to allow additional time for motions and briefing related to the TRO.

8.[8] After Plaintiffs moved for an extension of time to file responses to the City's motions, the Court extended Plaintiffs' response deadlines for the motion to dissolve and the motion to dismiss to August 22, 2020 and August 24, 2020, respectively,[9] *see* ECF No. 14. On August 20, 2020, Plaintiffs filed a motion to stay the proceeding and extend the TRO, ECF No. 16. The Court denied the motion, but nonetheless found it appropriate to extend the TRO until September 7, 2020, given the extensive motion practice. ECF No. 17. The matter is now ripe for review.

**Discussion**

Plaintiffs did not file a proper response to the City's Motion to Dismiss but instead filed a motion for leave to amend their complaint,[10] acknowledging that their initial complaint was hastily drafted and "in-artfully" pled.[11] In light of Plaintiffs' failure to address the City's arguments in support of its motion to dismiss, the motion is granted and the Complaint is dismissed against the City without prejudice.[12] *See* N.D. Fla. Loc. R. 7.1(H).

---

[8] On August 10, 2020, Plaintiffs filed their Motion to Remand, ECF No. 9, and a memorandum in support of their motion for contempt, ECF No. 10. On August 25, 2020, the Court denied the motion to remand, ECF No. 21.

[9] The Court denied Plaintiffs' request for an indefinite extension of time; instead, it granted a 10-day extension of the response deadlines, which the City did not oppose.

[10] Plaintiffs failed to address any of the arguments raised by the City.

[11] This is a gross understatement. The Initial Complaint—filed not by a *pro se* litigant but by a member of the Florida Bar—miscited civil statutes, wrongly cited to criminal statutes, and asserted patently meritless claims.

[12] The claims against Secretary Lee remain pending, as she has yet to appear or respond to the Complaint.

CASE NO. 3:20cv5681-MCR-EMT

Regarding the motion to amend, Plaintiffs' proposed amended complaint suffers from many of the same careless errors as the initial complaint. Plaintiffs' counsel is admonished to do better. But even more problematic for Plaintiffs is the fact that the proposed amended complaint is legally infirm.

The proposed amended complaint drops a number of claims from the initial complaint;[13] adds two new plaintiffs, Wesley Odom and his company, Go Retro, Inc.; and asserts new claims for "breach of a public trust agreement" under state law and for free speech and free exercise of religion under the Florida Constitution against the City.[14] Under the Federal Rules of Civil Procedure, a plaintiff who fails to amend his complaint within 21 days of service of a Rule 12(b) motion "may amend its pleading only with the opposing party's written consent or the court's leave."[15] Fed. R. Civ. P. 15(a)(2). Rule 15 further provides that "[t]he court should freely give leave when justice so requires." *Id.* Nonetheless, "denial of leave to

---

[13] *See* N.D. Fla. R. 15.1(A) ("Allegations in a prior pleading that are not set out in the amended pleading are deemed abandoned . . . .").

[14] "Florida's courts have treated the Free Speech and Free Exercise Clauses of the Florida Constitution as being coextensive with those embodied in the United States Constitution, and have adopted the same principles and methods of analysis." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1228 n.2 (11th Cir. 2019) (citing *Cafe Erotica v. Fla. Dep't of Transp.*, 830 So. 2d 181, 183 (Fla. 1st DCA 2002); *Toca v. State*, 834 So. 2d 204, 208 (Fla. 2d DCA 2002)).

[15] Plaintiffs failed to amend their complaint within 21 days after service of the City's motion to dismiss. *See* Fed. R. Civ. P. 15(a).

amend is justified by futility when the 'complaint as amended is still subject to dismissal.'" *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999).

As a threshold matter, Plaintiffs lack standing. Standing is a fundamental jurisdictional prerequisite that originates from the case or controversy requirement of Article III of the Constitution.[16] *See Gardner v. Mutz,* 962 F.3d 1329, 1338 (11th Cir. 2020) ("[T]he standing doctrine is an essential and unchanging part of the case-or-controversy requirement.") (internal quotations and citations omitted). Standing has three essential elements: (1) an injury in fact; (2) a causal connection between the injury asserted and the defendant's conduct; and (3) an injury that is likely to be redressed by a favorable decision. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *See id*. (internal quotations and citations omitted). An injury is only concrete when it is "*de facto*" and "real", not merely "abstract." *See Mutz*, 962 F.3d at 1341. Moreover, "purely psychic injuries arising from disagreement with government action" do not meet the concreteness requirement. *Id.* (citing *Diamond v. Charles*, 476 U.S. 54, 67 (1986); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

---

[16] The Eleventh Circuit has recognized that "Article III standing requirements apply to state-law claims brought in federal court." *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124–25 (11th Cir. 2019), *cert. denied*, 207 L. Ed. 2d 159 (June 1, 2020) (citing *Nicklaw v. Citimortgage, Inc.*, 839 F.3d 998, 1002–03 (11th Cir. 2016)).

417–18 (2013)); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). To meet the particularity requirement, the alleged injury must "affect the plaintiff in a personal and individual way" that is "distinct" to the plaintiff. *See Mutz*, 962 F.3d at 1342. In order to establish a particularized injury, the plaintiff must show that he is not merely a "concerned bystander" seeking "vindication of value interests," *id.* (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013)); instead, he must show that he "has been directly affected apart from his special interest in the subject at issue." *See Mutz*, 962 F.3d at 1342 (citing *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004)). The imminence requirement "ensure[s] the alleged injury is not too speculative for Article III purposes," by requiring the plaintiff to show that the threatened injury is "*certainly* impending." *See Clapper*, 568 U.S. at 409 (quotations omitted). Notably, "'[a]llegations of *possible* future injury' are not sufficient." *See id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

In the proposed amended complaint, Plaintiffs state that the purpose of their lawsuit "is to protect the Monument from inadvertent or intentional destruction." ECF No. 23 at 14. In a section marked "CONCLUSION", Plaintiffs seek:

> . . . equitable relief stating that the City commit to use any and all resources to safely move the Monument under a plan directed and conceived by the [Architectural Review Board ("ARB")], the Secretary of State of the State of Florida and [t]he US Department of the Interior, and, furthermore, seek injunctive relief barring the City from taking any further action related to the

movement of the Cenotaph without first establishing to this Court that they [sic] have a plan that ensures the safe movement of the Monument . . . .

*Id*. at 12–13.   In another section marked "STATEMENT OF RELIEF REQUESTED", Plaintiffs request this Court to, *inter alia*:

> (a) Enter a declaratory judgment that the relocation of the Monument without attestation from ARB, Secretary of State and Department of Interior that City's Plan [sic] is improper.  Or in the alternative, find that Plaintiffs [sic] Federal rights would be violated by any movement of the monument and order that no relocation be attempted.
>
> (b) Enter a temporary injunction prohibiting the City Council from ordering the relocation of the Monument without first receiving a feasibility study from the ARB which does not compromise the structure or Historical value of the Cenotaph . . . .

*Id.* at 15. It is difficult to tell what the plaintiffs are claiming their injury is.  On the one hand, they have no constitutional (or other) objection to the cenotaph's removal with a "proper" and "safe" removal plan, while on the other, they claim their constitutional rights will be violated by removal without such a plan, yet they do not claim any constitutional right in a removal plan.  Setting aside the nonsensicalness of this, it appears Plaintiffs' entire lawsuit is premised on a "safe" removal plan, the absence of which they fear will result in the cenotaph's damage or destruction.

First, Plaintiffs have failed to show any legally protected interest in a "safe" removal plan, *see Lujan*, 504 U.S. at 560, and their allegations that the cenotaph could possibly be damaged or destroyed in the absence of a such a plan are entirely too speculative to confer standing. *See Clapper*, 568 U.S. at 409 (recognizing that

"the threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (internal quotations and alterations omitted). Second, to the extent Plaintiffs allege their constitutional rights will be violated by *any* removal of the cenotaph (i.e., even with a plan), they still lack standing. In the proposed amended complaint, Plaintiffs attempt to reframe their free speech right as the right to speak about the confederacy and/or confederate soldiers at Florida Square, and they claim removal of the cenotaph will "effectively block" or otherwise have a "profound material impact" on this speech right.[17] ECF No. 23 at 11. This too makes no sense. There is no allegation, whatsoever, that Plaintiffs are being restricted from speaking at Florida Square or that their speech has been restricted by the City in anyway.[18] Nor could there be. By removing the cenotaph, the City is not preventing anyone from speaking about anything. *See Patterson v. Rawlings*, 287 F. Supp. 3d 632, 641 (N.D. Tex. 2018) (finding that an

---

[17] Plaintiffs initially alleged "that removing the *Cenotaph's memorial speech* is eliminating their constitutionally guaranteed freedom of expression and speech rights." ECF No. 1-1 at 12 (emphasis added). They now concede the cenotaph is "undisputed government speech." ECF No. 23 at 11. Additionally, while Plaintiffs have dropped their First Amendment claim under the United States Constitution and now only allege a free speech claim under the Florida Constitution, they still reference the First Amendment and the United States Constitution in their proposed amended complaint. *See* ECF No. 23 at 4. To the extent Plaintiffs are still attempting to assert a First Amendment claim under the United States Constitution, it would be futile for the reasons discussed herein. *See Cambridge Christian Sch., Inc.*, 942 F.3d at 1228 n.2.

[18] Plaintiffs' citation to *Knight First Amendment Inst. At Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) is seriously misplaced. That case involved the blocking of certain users from President Trump's social media account, which the court found to be a public forum for First Amendment purposes. *See id.* at 237–39. Here, there is no allegation that Plaintiffs are in any way being restricted from speaking at Florida Square, the alleged public forum at issue.

organization did not have standing to bring a First Amendment claim when they failed to "allege that the city took any action that would prevent [its member] from expressing [his] political view"). To the extent any sense could be made from these allegations, any claimed injury is far too abstract to confer standing. *See Mutz*, 962 F.3d at 1329 ("[T]he plaintiffs' inchoate agreement with what they take to be the cenotaph's meaning or message—and their consequent disagreement with the monument's relocation [or removal]—does not alone give rise to a concrete injury for Article III purposes."); *see also Patterson*, 287 F. Supp. 3d at 641 (allegation that the organizational plaintiff's member "*shares* the political view communicated to the public by the Confederate monuments . . . . does not explain how the removal of confederate monuments from City-owned property prevents [him] from expressing *his* political viewpoint.").

Plaintiffs similarly lack standing to bring a free exercise of religion claim. Plaintiffs' free exercise of religion claim, raised in Count II of their proposed amended complaint, states in its entirety:

> Plaintiffs, and their members, allege prohibition of the free exercise of their religion as guaranteed by the Florida constitution, to pay memorial respects to their dead family members in the location they have done so for generations, [sic] by the City's act of removal of the Cenotaph from the Public Square.

ECF No. 23 at 11–12. No facts are incorporated into this Count, but even considering facts alleged elsewhere in the proposed amended complaint, Plaintiffs' allegation that they will be prohibited from holding "quazi-religious" [sic] memorial

ceremonies or services in Florida Square is a mere a figment of their imagination. *Id.* at 7, 9. There is no allegation, nor could there be, that the City is actually prohibiting or intending to prohibit Plaintiffs from holding memorial ceremonies, or from conducting any other religious activity, in Florida Square by the removal of its cenotaph.[19] *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (recognizing, in the context of the government's administration of its own property, that "[t]he crucial word in the constitutional text is 'prohibit': 'For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'") (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring)). In short, disagreement with the City's decision to remove the cenotaph alone, even when "phrased in constitutional terms," does not give rise to Article III standing.[20] *Valley Forge Christian Coll.,* 454 U.S. at 485–86 ("[T]he psychological

---

[19] Nowhere in the proposed amended complaint have Plaintiffs alleged that they will be unable to engage in their political speech or conduct their memorial ceremonies after the cenotaph is removed. They will still be able to engage in these activities in Florida Square or, potentially, where the cenotaph is relocated. As noted above, any allegation that the cenotaph will not be properly relocated is speculative.

[20] Furthermore, Plaintiffs' free exercise claim is conclusory and fails to adequately allege a "sincerely held religious belief" that Plaintiffs are acting upon. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *see also GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1256 (11th Cir. 2012) ("[A] plaintiff must allege a constitutionally impermissible burden on a sincerely held religious belief to survive a motion to dismiss."). The proposed amended complaint's inadequacy leads the Court to question what religious belief will be impermissibly burdened by removal of the cenotaph – a belief in The South's history? The Confederacy? The monument itself? There simply is no free exercise of religion claim here.

CASE NO. 3:20cv5681-MCR-EMT

consequence presumably produced by observation of conduct with which one disagrees [i.e., removal of the cenotaph] . . . is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.").

Plaintiffs also assert municipal taxpayer standing through the addition of Wesley Odom as a plaintiff. In their Motion to Amend, Plaintiffs argue that they have adequately alleged that Mr. Odom is a municipal taxpayer in that he resides in, owns property in, and pays municipal property taxes to, the City of Pensacola, and that removal of the cenotaph unconstitutionally infringes his free speech rights, and thus there is taxpayer standing.

"It is settled law that municipal taxpayers have standing to challenge, as unconstitutional, expenditures by local governments." *Pelphrey v. Cobb Cty.*, 547 F.3d 1263, 1280 (11th Cir. 2008); *Gagliardi v. TJCV Land Trust*, 889 F.3d 728, 732-33 (11th Cir. 2018). For starters, the municipal taxpayer must establish that he is a resident of the municipality and that tax expenditures were used for the alleged offensive practice. *Pelphrey*, 547 F.3d at 1280; *see also Doremus v. Board of Educ.*, 342 U.S. 429, 434 (1952) (requiring a taxpayer's action to be "a good-faith pocketbook action"). Here, although the proposed amended complaint adequately alleges that Mr. Odom is a resident and taxpayer of the City, it contains no allegation that taxpayer funds are being used for removal of the cenotaph. The proposed

amended complaint states only that "the City Council voted to start the '30-day clock' to remove" the cenotaph, that a City memorandum recommended the removal, and that the "City has started the removal process" by fencing the square and determining a removal budget. ECF No. 23 at 6. There is nothing stating that tax revenues will be used to fund the removal.[21] "[I]f no tax money is spent on the allegedly illegal activity," then the "plaintiff's status as a municipal taxpayer is irrelevant" for purposes of standing. *See Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988), *cited with approval in Pelphrey,* 547 F.3d at 1281. Alleging that the City has authorized the project and is considering proposals to determine its cost is simply not the same as alleging that the City in fact is spending *tax* revenue on the project. *See generally Patterson*, 287 F. Supp. 3d at 642–43 (finding no taxpayer standing where plaintiffs did not allege that the city used or intended to use tax revenues; instead, the city manager was authorized to use the city's excess revenue for removal and sought private funding to reimburse the expenses).

Plaintiffs also fail to plausibly allege a constitutionally offensive practice. Again, Plaintiffs concede in the proposed amended complaint that the cenotaph itself

---

[21] The Court notes that Plaintiffs attached a proposed city budget to the proposed amended complaint. Even considering the budget proposal, it is insufficient to plausibly allege municipal taxpayer standing because it does not indicate that the proposed budget would be funded by city tax revenue.

is government property and government speech, and thus, they have no protected speech right in preventing its removal. Therefore, municipal taxpayer standing is not plausibly alleged in the proposed amended complaint, and consequently, amendment is futile.[22]

Lastly, in their proposed amended complaint, Plaintiffs assert a claim for "breach of public trust agreement" against the City. More specifically, relying on *Crapo v. Provident Grp.—Continuum Props., LLC* (*Crapo II*), 238 So. 3d 869 (Fla. 1st DCA 2018), Plaintiffs allege that "a public trust was formed" when the City originally erected and dedicated the cenotaph and that the City, as trustee, has a fiduciary duty to "preserve and protect" its residents' "beneficial interest" in the cenotaph. *See* ECF No. 23 at 10–11. According to Plaintiffs, the City violated this fiduciary duty by "unilateral[ly] deci[ding] to remove" the cenotaph. *Id*. at 10.

There are several problems with this claim. First and foremost, as with the constitutional claims discussed above, Plaintiffs have failed to identify a concrete and particularized injury-in-fact to a legally protected interest in the context of this claim. *See Spokeo*, 136 S. Ct. at 1547. Thus, they are without standing to proceed on it. *See id*. Plaintiffs' allegations also do not plausibly support any legally recognized cause of action. For both of these reasons—lack of standing and failure to assert a cognizable claim—amendment of the complaint to add a "breach of public

---

[22] Plaintiffs do not argue that any other individual has municipal taxpayer standing.

trust agreement" claim would be futile. Only the latter reason warrants further comment.

There is no recognized legal theory in Florida—none—on which relief may be granted for "breach of public trust agreement." The *Crapo* litigation, which, again, Plaintiffs cite as the basis for their "breach of public trust agreement" claim, is not a "public trust" case at all. There, Florida's First District Court of Appeal held that housing facilities legally owned by a third-party nonprofit corporation were immune from ad valorem taxation because the facilities were equitably owned by a public university. *See* 238 So. 3d at 869. The university's equitable ownership of the property arose from a series of documents "establish[ing] the creation of a trust" for the university's benefit, with the third-party legal owner of the property serving as trustee. *See Provident Grp.—Continuum Props., LLC v. Crapo ("Crapo I")*, 157 So. 3d 409, 411 (Fla. 1st DCA 2015). Those documents were "replete with statements regarding the powers and duties of [the trustee] for the benefit of the university," *id.*, including provisions stating the trustee's exclusive function was to acquire, develop and operate student housing facilities for the benefit of the university and its students; all surplus cash flow or profit from the facilities would be reinvested in the trust property or otherwise used solely for the university's benefit; the university was given the right to approve all project plans, uses, financing, operations and rental terms, as well as rights to be named as an insured

for the property and to condemnation proceeds if the property was taken; if the third-party corporate trustee ceased to exist, the trust property would be first distributed to creditors and then to the university; and on repayment of the facilities' financing, the university (for no payment) would be entitled to a deed for clear legal title to the trust property.  *See Crapo II*, 238 So. 3d at 870–71, 875.  Consequently, the university was the equitable and beneficial owner of the property.  *Id*.  Because the university itself was immune from taxation, its equitably owned property was immune from ad valorem taxation.  *See id*.

Plaintiffs have not even attempted to explain how or why they believe the *Crapo* litigation establishes a legal theory of liability for "breach of public trust." Presumably, this is because they cannot—neither of the *Crapo* decisions even references a "public trust," much less recognizes or discusses any legal theory of that nature.  The *Crapo* litigation was solely about "the concept of equitable ownership in ad valorem taxation," which "ha[d] long been a part of Florida law."  *See Crapo II*, 238 So. 3d at 876.  The instant case, however, does not even come close to that. Therefore, *Crapo I* and *II* are wholly inapplicable here.

To the extent Plaintiffs mean to allege a violation of the traditional "public trust doctrine," that theory is likewise wholly inapplicable here.  The public trust doctrine originated from the common law principle that sovereign governments, like the state, hold "all navigable waters and the land beneath them" in trust for the public

good.  *Murphy v. Dep't of Nat. Res.*, 837 F. Supp. 1217, 1219 (S.D. Fla. 1993).  As such, the state has a duty to protect both those natural resources and public access to them on the public's behalf.  *See 5F, LLC v. Dresing*, 142 So. 3d 936, 946–47 (Fla. 2d DCA 2014).  Importantly, the "public trust doctrine [is] a matter of state law" and its "contours" thus are defined by each state.  *See PPL Montana, LLC v. Montana*, 565 U.S. 576, 1235 (2012).  In Florida, the public trust doctrine is codified in article X, section 11 of the Florida Constitution, *see id*. at 945, and explicitly applies only to "lands under navigable waters . . . , including beaches below mean high water lines," *see* Fla. Const., art. X, § 11.[23]  Plaintiffs have identified no Florida authority, and the Court has found none, expanding the doctrine's scope beyond those narrow confines.  As this case does not involve submerged lands, or beach and shore areas between the high and low tide marks, held by the State of Florida, the traditional public trust doctrine is inapplicable.

For the foregoing reasons, the allegations against the City in Plaintiffs' proposed amended complaint do not establish standing and/or state a claim for relief that is plausible on its face.  Therefore, denial of leave to amend is justified by

---

[23] Fla. Const., art. X, § 11 provides as follows:

The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people.  Sale of such lands may be authorized by law, but only when in the public interest.  Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest.

CASE NO. 3:20cv5681-MCR-EMT

futility. The Court decides nothing more and nothing less. To be clear, the historical and cultural significance of the cenotaph to the Pensacola community are not for this Court to decide. Today's decision is premised solely on the applicable constitutional, statutory and common law principles that govern the legal claims alleged by Plaintiffs. The Court certainly hopes that, consistent with the Mayor's assurances to the Council, the City will take "the utmost care" in removing and relocating the cenotaph.[24] However, Plaintiffs have alleged no legal basis entitling them to block or interfere with the City's removal and relocation decisions. Consequently, their claims against the City are due to be dismissed and leave to amend their complaint denied as futile.

Accordingly:

1. Defendant City of Pensacola's Motion to Dismiss, ECF No. 7, is **GRANTED**. Counts One through Seven are hereby **DISMISSED WITHOUT PREJUDICE**.

2. Plaintiffs' Motion for Leave to Amend Complaint, ECF No. 20, is **DENIED**.

3. In light of the Court's ruling on Defendant City of Pensacola's Motion to dismiss and its conclusion that further amendment would be futile, Defendant's Motion to Dissolve Temporary Restraining Order, ECF No. 8, is **GRANTED**, and the TRO is hereby **DISSOLVED**.

---

[24] *See* City of Pensacola City Counsel, Special Meeting Minutes dated July 14, 2020 at 4, available at https://pensacola.legistar.com/Calendar.aspx (last visited August 28, 2020); *see supra* n. 5.

4. Plaintiffs' Motion for Order of Contempt, *see* ECF Nos. 1-1, 10, is **DENIED AS MOOT**.

**DONE AND ORDERED** this 2nd day of September, 2020.

*s/ M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**